IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ENVIRONMENTAL PROTECTION )
AND INFORMATION CENTER, a )
California nonprofit )
corporation, )
                                 )   No. 02:04-cv-1705-GEB-KJM
              Plaintiff,         )
                                 )   ORDER
        v.                       )
                                 )
UNITED STATES FOREST SERVICE,    )
                                 )
              Defendant.         )
————————————————————————————————)

          Pending are cross-motions for summary judgment on whether

Defendant violated the National Environmental Policy Act ("NEPA"),

42 U.S.C. §§ 4321-70, and the National Forest Management Act ("NFMA"),

16 U.S.C. §§ 1600-87, in issuing a Finding of No Significant Impact

("FONSI") with regards to a tree thinning project in the Yolla Bolla

Ranger District of the Shasta-Trinity National Forest, commonly called

the East Fork Project or East Fork Timber Sale ("Project").[1]  The

Project authorizes the thinning and treatment of fire fuels on

approximately 2,077 acres of land in the Shasta-Trinity National

_____

[1]  A hearing on the motions was held July 15, 2005.

1

Forest ("STNF").  (Admin. R. at 1343.)  Defendant prepared an Environmental Assessment ("EA") to determine whether the Project's impacts on the environment were likely to be significant, as well as the alternative of conducting no action. (Id. at 1350-63.)[2] Thereafter, Defendant issued a Determination Notice ("DN") and a FONSI in lieu of an Environmental Impact Statement ("EIS"). (Id. at 1276-84.)

Plaintiff argues that Defendant should have prepared an EIS in conjunction with the Project because there are substantial questions whether the Project's impacts are likely to be significant. (Pl.'s Br. Supp. Summ. J. at 2-22.)  Alternatively, Plaintiff argues that the EA is flawed because Defendant failed to adequately analyze the impacts of the Project. (Id. at 22-42.)  Plaintiff also argues that the EA failed to analyze a reasonable range of alternatives, or to document that the Project will meet the Defendant's stated purpose and need. (Id. at 42-49.)  Finally, Plaintiff argues that the Project violates NFMA. (Id. at 49-55.)  Plaintiff seeks an injunction preventing Defendant from carrying out the Project until the Defendant complies with the requirements of NEPA and NFMA. (Id. at 55; Compl. at ¶¶ 18-19.)

Defendant argues that its DN and FONSI comply with the

---

[2]    An EA is a "concise public document" that "briefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement," or issue a FONSI.  40 C.F.R. § 1508.9(a)(1); see Cronin v. United States Dep't of Agric., 919 F.2d 439, 443 (7th Cir. 1990) (describing the EA as a "rough-cut, low-budget environmental impact statement.").  The EA must include "brief discussions of the need for the proposal, of alternatives, as required by section 102(2)(E) [of NEPA], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."  40 C.F.R. § 1508.9.

requirements of NEPA and NFMA.  Alternatively, Defendant argues that even if its action violates NEPA or NFMA, Plaintiff is not entitled to injunctive relief.

**ANALYSIS**

I.          Standard of Review

The Administrative Procedures Act ("APA"), 5 U.S.C. §§ 500-596, 701-706, provides the standard of review for Plaintiff's challenge under NEPA and NFMA.  Lujan v. Nat'l Wildlife Fed., 497 U.S. 871, 882 (1990); Ecology Center, Inc. v. United States Forest Serv., 192 F.3d 922, 924-25 (9th Cir. 1999).  Pursuant to the APA, a court should "set aside [an agency's] actions, findings, or conclusions if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  Ocean Advocates v. United States Army Corps of Eng'rs, 361 F.3d 1108, 1118 (9th Cir. 2004) (quoting 5 U.S.C. § 706(2)(A)).  "Courts apply a 'rule of reason' standard in reviewing the adequacy of a NEPA document."  Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt., 387 F.3d 989, 992 (9th Cir. 2004) (citing Churchill County v. Norton, 276 F.3d 1060, 1071 (9th Cir. 2001)).  "Under this standard, we ask 'whether an [environmental review] contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences.'"  Churchill County, 276 F.3d at 1071 (citation omitted); accord Arizona Cattle Growers' Ass'n v. United States Fish & Wildlife Serv., 273 F.3d 1229, 1236 (9th Cir. 2001) (holding that the reviewing court "must determine whether the agency articulated a rational connection between the facts and the choice made.").

"The court must defer to an agency conclusion that is 'fully informed and well-considered,' but need not rubber stamp a 'clear

1  error of judgment.'" <u>Anderson v. Evans</u>, 371 F.3d 475, 486 (9th Cir.

2  2004) (quoting <u>Blue Mountains Biodiversity Project v. Blackwood</u>, 161

3  F.3d 1208, 1211 (9th Cir. 1998)).  The Court's "task in reviewing NEPA

4  claims is simply to ensure that the procedure followed by the agency

5  resulted in a reasoned analysis of the evidence before it, and that

6  the agency made the evidence available to all concerned."  <u>Cold</u>

7  <u>Mountain v. Garber</u>, 375 F.3d 884, 893 (9th Cir. 2004) (quoting <u>Friends</u>

8  <u>of Endangered Species, Inc. v. Jantzen</u>, 760 F.2d 976, 986 (9th Cir.

9  1985)).[3]

10  II.       <u>NEPA</u>

11         A.   *Did Defendant act arbitrarily and capriciously in*
              *finding that the Project poses no significant*
12             *impacts to the human environment?*

13         NEPA requires federal agencies to prepare an EIS for "major

14  federal actions significantly affecting the quality of the human

15  environment."  42 U.S.C. § 4332(2)(c).  "Human environment" is broadly

16  defined "to include the natural and physical environment and the

17  relationship of people with that environment."  40 C.F.R. § 1508.14.

18  "Significantly" as used in NEPA requires considerations of both

19  context and intensity.  <u>Id.</u> § 1508.27.  Context refers to the short-

20  term and long-term effects on "society as a whole (human, national),

21  the affected region, the affected interests, and the locality."  <u>Id.</u>

22  § 1508.27(a).  "Intensity refers to the severity of the impact," and

23  the Council on Environmental Quality ("CEQ") identifies ten factors to

24  be evaluated when analyzing intensity.  <u>Id.</u> § 1508.27(b).  To prevail

25

26         [3]   Plaintiff's motion to strike Exhibit C to Defendant's
     cross-motion for summary judgment, which illustrates forest
27   conditions before and after thinning, is granted because the
     photographs in the Exhibit were not presented to Defendant when
28   it issued the FONSI.  <u>See</u> <u>Citizens to Preserve Overton Park v.</u>
     <u>Volpe</u>, 401 U.S. 402, 419 (1971).

4

on its claim that Defendant's issuance of a FONSI  instead of

preparing an EIS violated NEPA, Plaintiff must raise substantial

questions that the Project may have a significant effect on the

environment.  <u>Idaho Sporting Cong. v. Thomas</u>, 137 F.3d 1146, 1150 (9th

Cir. 1998).  Plaintiff argues that the intensity factors relevant to

the Project include:

> (1) Impacts that may be both beneficial and
> adverse.  A significant effect may exist even if
> the Federal agency believes that on balance the
> effect will be beneficial. . .
> (3) Unique characteristics of the geographic area
> such as proximity to . . . ecologically critical
> areas.
> (4) The degree to which the effects on the quality
> of the human environment are likely to be highly
> controversial.
> (5) The degree to which the possible effects on
> the human environment are highly uncertain or
> involve unique or unknown risks. . . .
> (7) Whether the action is related to other actions
> with individually insignificant but cumulatively
> significant impacts.  Significance exists if it is
> reasonable to anticipate a cumulatively
> significant impact on the environment.
> Significance cannot be avoided by terming an
> action temporary or breaking it down into small
> component parts. . . .
> (9) The degree to which the action may adversely
> affect an endangered or threatened species or its
> habitat that has been determined to be critical
> under the Endangered Species Act of 1973.

(Pl.'s Br. Supp. Summ. J. at 3-4 (citing 40 C.F.R. § 1508.27(a)).)

Plaintiff presents separate arguments regarding factors (3)

and (4).  Factors (5), (7), and (9) are subsumed in Plaintiff's

arguments that the Project significantly affects the Pacific Fisher,

Coho salmon and spring-run Chinook salmon, and the Northern Spotted

Owl.  Factor (5) is also pertinent to Plaintiff's argument that

Defendant relied on a faulty survey when identifying areas susceptible

to thinning.

1.          <u>Unique Geologic Characteristics</u>

          Plaintiff argues that the Project "is located in areas with unique ecological characteristics" because portions of the Project area fall within the East Fork Trinity River Watershed, which, Plaintiff contends, is "an area of pristine biological value for riparian dependent species."  (Pl.'s Br. Supp. Summ. J. at 4.) Further, Plaintiff argues that the Project adversely affects areas with unique geologic or ecologic characteristics because it calls for logging in Late Successional Reserves ("LSR") and Riparian Reserves. (<u>Id.</u>)

          The EA, however, contradicts Plaintiff's assertion that the Project area is of pristine biological value.  The EA describes the Project area as consisting of "single-storied, young-growth mixed conifer stands, which have had previous harvest entries . . . . Stands are currently stocked with too many trees, and are beyond site capacity to maintain a healthy, vigorous forest condition."  (Admin. R. at 1341.)  While Tier-1 Watersheds, LSR, and Riparian Reserves *may* consist of unique ecologic and/or geologic conditions, Plaintiff fails to demonstrate how the Project area actually possesses unique characteristics.  Therefore, this factor does not warrant an EIS.

2.          <u>Controversy</u>

          Plaintiff argues that because "the East Fork project implicates some of the most contentious and important issues in contemporary forest management," it is "inherently controversial" and requires the preparation of an EIS.  (Pl.'s Br. Supp. Summ. J. at 5.) "A federal action is controversial if 'a substantial dispute exists as to [its] size, nature, or effect . . . .'  Controversy does not refer to the existence of opposition to a use."  <u>Northwest Envt'l Def. Ctr.</u>

1  v. BPA, 117 F.3d 1520, 1536 (9th Cir. 1997) (quotations and citations

2  omitted).  Plaintiff has not made a showing that there is a

3  substantial dispute as to the size, nature, or effect of the Project.

4  Cf. Sierra Club v. Babbitt, 69 F. Supp. 2d 1202, 1219-20 (E.D. Cal.

5  1999) (holding that sufficient controversy exists to warrant an EIS

6  where Plaintiff cites to two specialists who raise concerns regarding

7  specific impacts of a project).  Therefore, this factor does not

8  warrant an EIS.

9  3.        Pacific Fisher

10          Plaintiff also argues that the Project significantly impacts

11  the Pacific Fisher ("fisher") by reducing canopy cover and removing

12  downed trees and snags.  (Pl.'s Br. Supp. Summ. J. at 8.)[4]  The fisher

13  (a member of the weasel family) is a Forest Service sensitive species,

14  but is not listed under the Endangered Species Act as either

15  endangered or threatened. See 69 Fed. Reg. 18770, 18770-81 (Apr. 8,

16  2004).  Plaintiff asserts that the Project will result in increased

17  road traffic, which increases the mortality factor for the fisher, and

18  disrupts the fisher's foraging and breeding habits.  (Pl.'s Br. Supp.

19  Summ. J. at 8-10.)  Further, Plaintiff argues that Defendant erred in

20  concluding that the Project does not significantly impact the fisher

21  because the EA does not (1) consider the harvesting of privately-held

22  lands in the analysis area, or (2) explain why removing structural

23  habitat components and opening the canopy cover through thinning poses

24

25

26

27          [4]    "Snags are typically dense woody areas created by

28  fallen trees or branches."  The Lands Council v. Powell, 395 F.3d
   1019, 1024 (9th Cir. 2005).

1 only an indirect impact on the fisher.  (Id. at 11.)[5]

2        Impacts to the fisher cannot be considered "significant"

3 under NEPA through the ninth CEQ factor because the fisher is not an

4 endangered or threatened species under the ESA.  40 C.F.R.

5 § 1508.27(b)(9).  While Plaintiff heavily relies on a statement the

6 Fish and Wildlife Service ("FWS") promulgated proposing the fisher be

7 listed under the ESA (Pl.'s Br. Supp. Summ. J. at 7-8 (citing 69 Fed.

8 Reg. 18770-80)), Plaintiff's argument does not rebut FWS's analysis of

9 the Project's potential impacts on the fisher, or FWS's finding that

10 the Project poses only indirect risks to the fisher, and that the

11 fisher should be able to "easily avoid" those risks because of its

12 mobility and versatility.  (Admin. R. at 1921-22, 1925.)  In addition,

13 the Project applies silvicultural prescriptions that result in

14 structural elements the fisher favors, thus addressing Plaintiff's

15 query of why removing structural habitat components and opening the

16 canopy cover through thinning poses only an indirect impact on the

17 fisher.  (Admin. R. at 1399, 1921-22, 1935.)  Defendant concluded,

18 after consulting with FWS, and considering its own analysis of the

19 fisher in the EA, that fishers are widely distributed across a variety

20 of habitat types in the Late Serral Assemblage.  This reveals that

21 Defendant satisfied its obligation to conduct a reasonably thorough

22 analysis on the Project's effects on the fisher.  See Churchill

23 County, 276 F.3d at 1071.  Further, the analysis and conclusion

24 reached in the FWS Biological Assessment and the EA rationally relate

25 to Defendant's ultimate finding that the Project does not

26

27      [5]   Plaintiff also argues that the EA fails to adopt a

28 proper survey estimating the number of fishers in the affected
area.  This argument is addressed below in section III.B.

1 significantly impact the fisher.  See <u>Arizona Cattle Growers' Ass'n</u>,

2 273 F.3d at 1236.

3 Plaintiff also contends that Defendant failed to consider

4 cumulative impacts on the fisher resulting from the proposed

5 harvesting of 300 acres on private property adjacent to the Project

6 area.  Defendant argues that Plaintiff should not be allowed to

7 litigate this issue because it did not mention this proposed private

8 activity in its comments regarding the Project or during the

9 administrative appeal.  (Def.'s Br. Opp'n Summ. J. at 20 (citing

10 <u>Vermont Yankee Nuclear Power Corp. v. Nat'l Resources Def. Council,</u>

11 <u>Inc.</u>, 435 U.S. 519, 553 (1978)).)  However, the private activity was

12 proposed after Plaintiff submitted its comment letter, and concurrent

13 with the issuance of the first administrative appeal decision.

14 (Admin. R. at 1270 (project proposed in December 2003), 861-869

15 (comment letter dated August 14, 2002; Dugan Decl. re Exhs. A-C ¶ 1,

16 Exh. C (first administrative appeal decision dated December 15,

17 2003).) Thus, Defendant's objection to Plaintiff's argument is

18 overruled.  Nevertheless, Defendant satisfied its NEPA obligation by

19 pointing to (1) a letter amending the FWS opinion and evaluating the

20 cumulative impacts posed by the proposed private action on the

21 Northern Spotted Owl ("NSO"), and (2) an expert opinion that the

22 fisher prefers habitat that the NSO also favors.  (Admin. R. at 1921-

23 22, 1951.)

24 4.      <u>Salmonid Species</u>

25 Plaintiff argues that the Project may significantly impact

26 Coho salmon, an ESA threatened species, and spring-run Chinook salmon.

27 (Pl.'s Br. Supp. Summ. J. at 12.)  Further, Plaintiff argues that the

28 Project will significantly impact critical fish habitat designated

9

under the ESA and Essential Fish Habitat ("EFH") designated under the Magnuson-Stevens Act. (Id.) Plaintiff contends the Project will increase coarse sediment to the tributaries of the East Fork South Fork Trinity River ("River"). (Id. (citing Admin. R. 1384).) This coarse sediment may reduce the depth of the River's confluence pool. (Id. at 12-13.) In addition, Plaintiff argues that an EIS is required because Defendant failed to respond to National Oceanic & Atmospheric Association's ("NOAA") recommendation that Defendant "should implement all road decommissioning and hydro-closures planned for the East Fork South Fork 5th-field watershed as described in the Roads Analysis Report: East Fork Watershed (USDS-FS 2003a)." (Admin. R. 1945.)

Regarding the Coho salmon, Defendant's and NOAA's biologists separately analyzed the potential impacts to the species and concluded that the Project is not likely to adversely affect the species or its habitat. (Admin. R. at 1374-75, 1385, 1944-45.) Therefore, the CEQ factor calling for an EIS due to adverse impacts to ESA-listed species is not violated. 40 C.F.R. § 1508.27(a)(9).

NOAA concluded that "adverse affects to EFH from Project activities is due to possible degradation of habitat used by Chinook salmon rather than coho salmon." (Admin. R. at 1945.) Defendant acknowledged NOAA's conclusion, but reasoned that "the fact that few adult spring-run Chinook salmon have been observed utilizing [the River's confluence pool], and [the confluence pool's] frequent use by the public, make the potential temporary loss [sic] pool depth and potential loss of its use by spring-run Chinook salmon insignificant to continued viability of this fish in the South Fork Trinity River." (Admin. R. at 1382-84.) Defendant has adequately explained why NOAA's finding of potential adverse impact to EFH does not constitute a

1  significant effect on the human environment under NEPA.

2         In addition, the FONSI indicates that Defendant and NOAA

3  reached "mutual agreements during . . . consultation," and that

4  certain procedures regarding road usage and closure were adopted.

5  (Admin. R. at 1277-78.)  This reference rebuts Plaintiff's assertion

6  that Defendant ignored NOAA's request that certain road closures be

7  implemented.  (Pl.'s Br. Supp. Summ. J. at 13-14.)

8         Plaintiff also complains that the Project does not consider

9  cumulative impacts to salmonid species involved with proposed logging

10 on adjacent private lands.  (Id. at 14.)  Defendant points to portions

11 of the EA that discuss potential effects on Management Indicator

12 Species ("MIS"), which include spring-run Chinook salmon, and ESA-

13 listed species, which include the Coho salmon.  (Admin. R. at 1400-

14 01).  Plaintiff does not explain how the proposed private project

15 raises a substantial question that significant impacts may occur to

16 the human environment; rather, Plaintiff simply concludes that the

17 proposal itself compels Defendant to prepare an EIS.  (Pl.'s Br. Supp.

18 Summ. J. at 14.)  This conclusory argument does not meet Plaintiff's

19 burden of showing that the proposed private logging raises a

20 substantial question of cumulatively significant effects to the human

21 environment.  Thomas, 137 F.3d at 1150.

22 5.        Northern Spotted Owl

23        Plaintiff also argues that the Project will have a

24 significant effect on the NSO.  The NSO is a threatened species under

25 the ESA.  55 Fed. Reg. 26,114 (June 26, 1990).  A total of 418 acres

26 of suitable NSO nesting/roosting habitat are proposed for harvest,

27

28

including 41 acres of critical habitat, and 64 acres of LSR.[6]  (Admin. R. at 1935.)  Plaintiff contends that four NSO activity centers are located within the Project analysis area, and that two of these centers will be logged, but that the EA fails to provide any documentation that the 100 acres of the best habitat around these activity centers will be protected.  (Pl.'s Br. Supp. Summ. J. at 15-16.)[7]  Further, Plaintiff argues that the EA fails to meaningfully analyze cumulative effects to the NSO.  (Id. at 18-19.)  Plaintiff also cites to materials outside the Administrative Record that allegedly contradict the EA's conclusion that "past, present, and reasonably foreseeable future actions are sufficiently discontinuous over space and time so as not to contribute to significant cumulative impacts to wildlife or their habitat."  Compare (Dugan Decl. re Exh. H ¶ 1, Exh. H), with (Admin. R. 1402).

The Biological Assessment and Evaluation ("BAE"), which is incorporated by reference into the EA, rebuts many of Plaintiff's contentions:

> Harvest prescriptions have been modified to maintain total canopy cover at or above 70% to retain snag densities at or above 2.5 per acre or as available and to retain large logs.  Although intermediate harvest of these stands will occur, suitable habitat components such as canopy cover, snag and log density, and structural diversity will be

---

[6]   The Northwest Forest Plan ("NWFP") creates a network of LSR for the purpose of providing enough habitat for the NSO to survive and recover, but allowing high levels of logging on lands outside the LSR.  (Dugan Decl. re Exhs. F & G ¶ 1, Exh. F.)  The areas outside the LSR are called matrix lands.  (Id.)

[7]   The NWFP requires that "one hundred acres of the best [NSO] habitat . . . be retained as close to the nest or owl activity center as possible for all known (as of January 1, 1994) [NSO] activity centers located on federal lands."  (Dugan Decl. re Exhs. F & G ¶ 1, Exh. G.)

> maintained to still meet criteria for
> suitable nesting/roosting habitat . . . .  No
> treatment of occupied spotted owl suitable
> nesting/roosting habitat is proposed and
> scheduled surveys are designed to locate any
> new colonization by owls.  These efforts will
> severely reduce the possibility of directly
> impacting spotted owls.

(Admin. R. at 1921.)  Thus, the BAE concludes that the Project "may affect, but is not likely to adversely affect [NSO]."  (Id. at 1925.) The BAE also notes that thinning in units of LSR or suitable NSO nesting/roosting habitat will be consistent with species management goals.  (Id. at 1924-25.)  Further, Plaintiff's contention that the Project is inconsistent with the NWFP and the STNF Plan is erroneous because both plans direct Defendant to encourage the development of late-successional forest conditions in the LSR that are overstocked through thinning.  (Id. at 169.)

As for Plaintiff's argument that Defendant ignored cumulative effects, Defendant amended the BAE to evaluate cumulative impacts on the NSO from the proposed private logging activity on nearby land.  (Id. at 1951.)  This amendment concluded that the proposed private action did not alter the ultimate conclusion that the Project may affect, but is not likely to adversely affect the NSO. (Id.)

6.        Database Integrity

Plaintiff claims that Defendant relied on a flawed GIS database (LMP 90) ("GIS database") in determining which lands were capable, available, and suitable for timber production.  (Pl.'s Br. Supp. Summ. J. at 20.)  Plaintiff also asserts that Defendant failed to respond to Plaintiff's repeated requests for access to the underlying data used to prepare the assessment of the Project, and

1   that Defendant's unresponsiveness prohibited a fully informed

2   commentary on the Project.  (Id. at 22.)

3        However, the GIS database was not the exclusive means of

4   identifying areas susceptible for thinning; candidate areas for

5   thinning were identified based on a habitat survey (Admin R. at 351-

6   484), a mass wasting survey (id. at 529-53), a Goshawk survey (id. at

7   631-53), water quality and fish habitat monitoring (id. at 674-77), a

8   serpentine soil survey (id. at 712-39), a skid trail survey (id. at

9   743-44), NSO surveys (id. at 745-64, 1110-35, 1250-61), a western pond

10  turtle survey (id. at 814-818), stand records (id. 829-30), a North

11  American breed bird survey (id. at 922-27), and the California

12  Wildlife Habitat Relationships information system (id. at 1335).  In

13  addition, "[t]he SMFU wildlife crew field typed all stands within the

14  affected area of the [East Fork South Fork] analysis, including up to

15  1/4 mile outside [the] analysis area boundary."  (Admin. R. at 1918.)

16  Consequently, the EA is distinguishable from those processes the Ninth

17  Circuit held in violation of NEPA because a Defendant neither relied

18  heavily on the GIS database, Lands Council v. Powell, 379 F.3d 738,

19  749-750 (9th Cir. 2004), amended by 395 F.3d 1019, nor acted in an

20  absence of knowledge regarding the intensity of environmental effects,

21  Nat'l Parks & Conservation Ass'n v. Babbitt, 241 F.3d 722, 732-733

22  (9th Cir. 2001).

23        B.   *Does the EA adequately analyze impacts?*

24        Plaintiff contends that even if an EIS is not required, "the

25  EA itself is flawed because the analysis it contains is not detailed

26  enough to allow the decision maker and the public to understand the

27  foreseeable impacts of the [P]roject."  (Pl.'s Br. Supp. Summ. J. at

28  22.)  Plaintiff asserts that the grounds for finding a significant

impact to the human environment discussed above in section II.A.
(*e.g.*, impacts to the fisher, salmon, and NSO) also provide grounds
for finding that the EA's analysis is inadequate. (Id. at 22-23.)
However, the EA is sufficient as to those matters addressed above
because the EA sets forth a "reasonably thorough discussion" of those
potential impacts.  See Churchill County, 276 F.3d at 1071.

1.        Sensitive Species and Management Indicator Species

Plaintiff asserts that the EA improperly addresses impacts
to sensitive species in a vague and conclusory manner. (Pl.'s Br.
Supp. Summ. J. at 23.)[8]  However, Plaintiff only cites to discrete
portions of Defendant's conclusions regarding impacts to sensitive
species.  Defendant provided a detailed analysis of potential impacts
to sensitive species in the EA, the Wildlife Report, and the Wildlife
BAE. (Admin. R. 1265-72, 1397-99, 1920-24.)  Defendant's analysis is
reasonably thorough.

2.        Riparian Reserves

In addition, Plaintiff argues that the EA does not comply
substantively with the Northwest Forest Plan Aquatic Conservation
Strategy ("ACS") because it "fails to demonstrate that the proposed
actions will maintain or improve riparian and aquatic habitat
conditions to comply with the ACS." (Pl.'s Br. Supp. Summ. J. at 27.)
Plaintiff also contends that the EA does not "adequately disclose
stand conditions within the Riparian Reserves," and ignores portions
of the East Fork Watershed Analysis ("Watershed Analysis") warning

---

[8]        Plaintiff also argues that the EA is inadequate because
it evaluates the habitat of Management Indicator Species ("MIS"),
rather than hard quantitative surveys of MIS. (Pl.'s Br. Supp.
Summ. J. at 23-24.)  This argument is addressed below in section
III.B.

1 against logging in Riparian Reserves.  (Id.)

2       The EA evaluates the Project against each of the ACS's nine

3 objectives and concludes that the Project will further riparian

4 habitat and improve stand structural diversity.  (Admin. R. at 1379-

5 81.)[9]  While the EA acknowledges that road reconstruction and

6 recommission may produce a possibility of sediment increase, "[t]he

7 potential for sediment delivery from road use will be insignificant

8 due to road improvements which decrease erosion including upgrading

9 culverts, outsloping, installation of rolling dips, and surface

10 rocking prior to haul."  (Admin. R. at 1380, 1943.)  No new roads will

11 be constructed in Riparian Reserves, and existing roads that would be

12 used will be improved to decrease road-related sediment production.

13 (Id. at 1379-81.)  Therefore, the Administrative Record demonstrates

14 that Defendant took a "hard look" at the Project's compliance with ACS

15 objectives.

16       Plaintiff cites to excerpts from the Watershed Analysis that

17 speak of logging in Riparian Reserves from a general standpoint, but

18 Defendant cites to portions of the Watershed Analysis indicating that

19 proposals to thin areas in the Riparian Reserves should be "identified

20

21       [9]    Defendant argues that the Project need not comply with
ACS objectives pursuant to a Record of Decision ("ROD") the
22 Department of Agriculture issued to clarify that "[ACS
objectives] were intended to be applied and achieved at the
23 fifth-field watershed scale and larger scales."  (Admin. R. at
1983.)  However, compliance with the ACS is necessary because
24 Defendant's DN and FONSI pre-date the ROD.  See Pac. Coast Fed'n
of Fishermen's Ass'n (PCFFA) v. Nat'l Marine Fisheries Serv., 71
25 F. Supp. 2d 1036, 1069 (W.D. Wash. 1999), affirmed at 265 F.3d
1028 (9th Cir. 2001).  Plaintiff's argument that the ROD
26 necessitates amending the EA is incorrect because the ROD does
not offer new information showing "that the remaining action will
27 affect the quality of the human environment in a significant
manner or to a significant extent not already considered."  Marsh
28 v. Oregon Natural Resources Council, 490 U.S. 360, 374 (1989).

and analyzed site-specifically through the NEPA process." (Admin. R. at 1805.)  The Watershed Analysis indicates that treatment, including commercial thinning, may "improve stand conditions (*i.e.,* assist the riparian reserve in attaining late successional characteristics)." (Id.)  The Watershed Analysis specifically identifies Prospect Creek, Texas Chow, and Dark Canyon – all areas where the Project proposes treatment – as Riparian Reserves that are currently not functioning properly because of a lack of large conifers and structural diversity. (Id. at 1805.)[10]  Thus, the Administrative Record does not support Plaintiff's arguments that Defendant failed to consider relevant portions of the Watershed Analysis or adequately disclose stand conditions in the Riparian Reserves.

3.      Roads and Road Densities

        Plaintiff argues that the EA fails to disclose adverse recommendations in the Watershed Analysis regarding road uses and road densities.  (Pl.'s Br. Supp. Summ. J. at 28-30.)  However, the EA indicates that the Project:

> deviate[s] from recommendations in the [Watershed Analysis] with regard to Road 28N66.  The [Watershed Analysis] recommended decommissioning the full length (2.5 miles) of Road 28N66. Approximately the last 1.3 miles of Road 28N66 has been decommissioned and will be removed later from the Forest Service Road System.  However, the first 1.2 miles will not be decommissioned as per [Watershed Analysis] recommendations.  The first 1.2 miles of 28N66 are needed for Proposed Action thinning opportunities.

---

        [10]    The EA also describes stand conditions in Riparian Reserves slated for treatment as "uniform structural condition, low tree species diversity, and heavy stocking."  (Admin. R. 1351.)

1  (Admin. R. at 1377.)  This reference in the EA rebuts Plaintiff's

2  contention that recommendations in the Watershed Analysis were

3  ignored.[11]

4  4.        Key Watershed, Water Quality, Riparian and Aquatic Habitat

5          Plaintiff argues that the EA fails to adequately disclose

6  and analyze adverse effects on water quality and riparian and aquatic

7  habitat within and downstream from the Project area resulting from

8  past logging.  (Pl.'s Br. Supp. Summ. J. at 30-31.)  In addition,

9  Plaintiff complains that the EA discusses water quality impacts from

10  coarse sediment, but not fine sediment.  (Id. at 33-34.)  Finally,

11  Plaintiff argues that the EA fails to consider cumulative effects on

12  water quality from road uses and adjacent land uses.  (Id. at 34-35.)

13          The Cumulative Watershed Effects ("CWE") Analysis Report

14  indicates that past timber harvest, roads on federal and private

15  lands, proposed actions on federal and private lands, and foreseeable

16  actions on federal and private lands are components of core data

17  layers used to perform the CWE analysis.  (Admin. R. at 1961.)

18          Defendant identifies the source of fine sediment in the

19  River, but selects coarse sediment as the factor most critical to

20  beneficial uses and water quality uses in water bodies the Project

21  might affect.  (Id. at 1066.)  Plaintiff's argument that fine sediment

22  should be deemed the factor most critical to beneficial uses and water

23

24          [11]   Plaintiff's argument that "[t]he EA fails to
25  demonstrate that the proposed road construction and
   reconstruction is consistent with the information and
26  recommendations for roads in the Watershed Analysis," (Pl.'s Br.
   Supp. Summ. J. at 29), is without merit because the
27  recommendations in the Watershed Analysis "are not [] legally
   binding commitment[s] enforceable under § 706(1) [of the APA]."
28  Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 124 S.
   Ct. 2373, 2384 (2004); (Pl.'s Reply. Br. Supp. Summ. J. at 8).

quality uses is erroneous because (1) Plaintiff mischaracterizes the Watershed Analysis to conclude that "fine sediment is a critical limiting factor in the watershed," (2) Defendant has "discretion to rely on the reasonable opinions of its own qualified experts." (Id. at 889, 1066, 1069, 1073, 1653, 1779); Marsh, 490 U.S. at 378.

Plaintiff's contention that the EA failed to consider various cumulative effects related to water quality is incorrect.  The cumulative effects related to water quality are addressed in the Biological Evaluation for Sensitive Plant Species and Supplementary Botanical Report (id. at 874, 876-77), the Hydrologist Report (id. at 888-901), the Fish Biological Assessment (id. at 1044-108), and the EA (id. at 1372-73, 1378).  The Project will comply with the Clean Water Act and North Coast Basin Plan.  (Id. at 345-350, 1038-39.)  Moreover, the EA also discloses that all potentially unstable areas have been mapped on the ground, and will not be included in the Project activities.  (Id. at 1360.)

5.      Late Successional Reserves

Plaintiff declares that it conducted a field inspection from which it concluded that many units will log large, healthy legacy trees in dominant and co-dominant crown positions.  (Ambrose Decl. ¶ 4.)[12]  Plaintiff contends that the EA fails to disclose the number of trees with a 25-inch diameter at breast height ("dbh") that will be

---

[12]    The Ambrose Declaration lacks foundation to establish that the photographed tree she declares is slated for logging is in an LSR.  The declaration requires drawing an inference that the declarant's conclusion that the tree in question is in "late successional forest" means that the tree is located in an LSR. (Ambrose Decl. ¶¶ 3-4.)  It is inappropriate, however, to draw the inference Ambrose suggests because Defendant's citations to the Administrative Record establish that no dominant trees in an LSR are proposed for treatment.  (Admin. R. at 1109, 1394, 1398.)

1  logged, or the number of trees in the LSR that will be logged.  (Pl.'s
2  Br. Supp. Summ. J. at 36-37.)  Finally, Plaintiff asserts that "the EA
3  fails to describe either the present or future distribution of snags
4  in the [P]roject area."  (Id. at 37.)

5        The Project proposes thinning 64 acres of single-storied,
6  overstocked, young-growth stands within an LSR.  (Admin. R. at 169,
7  1266, 1341.)  No late-successional or old growth stands are proposed
8  for harvest within the LSR.  (Admin. R. at 1266, 1398.)  The condition
9  of the LSR acres slated for treatment is set forth in the EA.  (Id. at
10 1397-98.)  Further, while "trees determined to be at a high risk for
11 mortality within the next five to ten years" are designated for
12 removal regardless of size, all large overstory trees in the LSR will
13 be retained, regardless of the risk of mortality.  (Id. at 1350,
14 1910.)  Therefore, contrary to Plaintiff's contentions, the EA
15 adequately addresses treatment of acreage in the LSR.

16       The total number of trees marked for harvest that are 25-
17 inches dbh or greater is set forth in the Administrative Record.  (Id.
18 at 1109.)  Further, the Project will meet snag density standards -
19 snags are retained under all harvest prescriptions, and are preferred
20 within the four stands supporting suitable spotted owl
21 nesting/roosting habitat.  (Id. at 1400, 1935.)

22 6.        Fire Risk and Fire Management

23       Plaintiff argues that the EA fails to consider the increased
24 likelihood of fire resulting from the reduction of canopy, the
25 exposure of the understory to more open sunlight, increased
26 temperatures and wind, and decreased air humidity and fuel moisture
27 levels.  (Pl.'s Br. Supp. Summ. J. at 38-39.)  Plaintiff also argues
28 that the EA fails to disclose that the ground and surface fuels will

1  not be adequately treated after logging, leading to an increased fire

2  hazard.  (Id. at 39.)

3         The EA (Admin. R. at 1366-67) and the Fire and Fuels Report

4  (Id. at 846-60) address fire hazards.  These analyses discuss the risk

5  of fire before and after the Project with reasonable thoroughness.

6  (Id.)

7  7.      Soils

8         Plaintiff also challenges the EA's evaluation of impacts to

9  soils.  The Soil Report, summarized in and incorporated by the EA,

10  discusses the Project's impacts to soils, including compaction,

11  displacement, erosion, and mass wasting.  (Admin. R. at 970-1005,

12  1385-88.)  This analysis is reasonably thorough despite Plaintiff's

13  contrary protestation.

14  8.      Cumulative Impacts

15         Further, Plaintiff challenges the EA's discussion of

16  cumulative impacts.  The EA and supporting analyses adequately

17  disclose and analyze cumulative effects.  (Admin. R. at 1370-73

18  (cumulative watershed effects), 1384-85 (cumulative effects to Coho

19  salmon), 1387-88 (cumulative soil effects), 1392-93 (cumulative

20  effects to Sensitive and Forest Plan Endemic Species), 1401-02

21  (cumulative effects to MIS).)  More particularly, the EA addresses the

22  proposed logging project on private inholdings within the Project

23  area.  (Id. at 1384, 1401-02.)  The Wildlife Report and the Biological

24  Assessment and Evaluation also considered cumulative effects stemming

25  from this proposed private action.  (Id. at 1951.)

26  9.      Reasonable Range of Alternatives

27         Plaintiff challenges the EA's failure to include a

28  discussion of more than the proposed action and no-action

21

alternatives.  The EA must include "brief discussions of . . . alternatives, as required by section 102(2)(E) [of NEPA]."  40 C.F.R. § 1508.9.  Section 102(2)(E) of NEPA directs all federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(2)(E).  The stated goals of a project determine the range of alternatives.  Carmel-by-the-Sea v. Dep't of Transp., 123 F.3d 1142, 1155 (9th Cir. 1995).  The rigor with which an agency must consider alternatives is less when an agency determines that an EIS is not required.  Sierra Club v. Babbitt, 69 F. Supp. 2d 1202, 1232 (E.D. Cal. 1999) (citing Mt. Lookout-Mt. Nebo Prots. Ass'n v. Fed. Energy Regulatory Comm'n, 143 F.3d 165, 172 (4th Cir. 1998)).

The EA considers two alternatives: the Project and the no-action alternative.  (Admin. R. at 1350-63.)  Plaintiff requested "that the EA develop and analyze an alternative that does not involve a commercial timber sale and does not remove any tree larger than 12-inch dbh, and does not involve any road construction or reconstruction."  (Admin. R. at 868.)  However, removing only trees of 12-inch dbh or smaller would not achieve the reduction in fuel ladders needed to protect larger stands from crown fire.  (Admin. R. at 1341-42, 1350-51.)  In addition, Plaintiff's proposal would not provide merchantable lumber as an economic offering, which is a stated purpose of thinning in the matrix lands.  (Admin. R. at 1341.)  Thus, Plaintiff has failed to demonstrate that Defendant's consideration of the Project and the no-action alternative violated NEPA because Plaintiff "had not offered a specific, detailed counterproposal that had a chance of success."  City of Angoon v. Hodel, 803 F.2d 1016,

1  1022 (9th Cir. 1986); accord Dep't of Transp. v. Public Citizen, 541
2  U.S. 752, 766-67, (2004) (holding plaintiffs' failure to propose
3  alternatives that the agency did not consider barred plaintiffs from
4  objecting to an EA on the ground that the agency failed adequately to
5  discuss potential alternatives to the proposed action).

6  10.      Fulfillment of Project's Purpose and Need

7          Plaintiff argues that the EA fails to demonstrate that the
8  Project meets the stated purpose and need, and contends that Defendant
9  attempts to hide the "disconnects between the [P]roject's purpose and
10 need, and the actual proposed action by restating the purpose and need
11 in terms that describe the proposed action."  (Pl.'s Br. Supp. Summ.
12 J. at 47.)

13         The EA states that thinning in matrix lands "is intended to
14 maintain suitable stand growth, improve tree vigor over time by
15 providing space for the trees retained to grow, and provide
16 merchantable wood removed as an economic offering."  (Admin. R. at
17 1341.)  On LSR lands, "[t]he purpose of thinning . . . is to reduce
18 the fire hazard of spreading crown fire by removing some of the
19 understory tree density, and to maintain stand growth toward late-
20 successional conditions by giving individual trees more room to grow."
21 (Id. at 1342.)  In Riparian Reserves, "[t]he purpose of thinning . . .
22 is to reduce the fire hazard of spreading crown fire by removing some
23 of the understory trees [sic] density, and to maintain stand growth
24 toward late-successional conditions by giving individual trees more
25 room to grow."  (Id.)  Defendant disclosed stand conditions and
26 thinning prescriptions consistent with the stated purpose.  (Id. at
27 1109, 1343-48, 1350-51, 1394, 1398.)  Therefore, the EA does not
28 violate NEPA for failure of the Project to meet the purpose of need

1  set forth in the EA because the selected alternative rationally

2  relates to the purpose and need described.

3  III.      <u>NFMA</u>

4          NFMA provides for the planning and management of national

5  forests at two levels: forest and project.  <u>See generally</u>, 36 C.F.R.,

6  § 219.3.  Defendant adopted the Shasta-Trinity National Forest Plan

7  ("STNF Plan"), which establishes goals and objectives for individual

8  units of the STNF, and provides specific standards and guidelines for

9  management of forest resources.  16 U.S.C. § 1604(g)(1)-(3); 36 C.F.R.

10  §§ 219.2, 219.3.  Proposed projects may be implemented if they are

11  consistent with the applicable forest plan, have been analyzed

12  pursuant to NEPA, and specifically approved by the responsible Forest

13  Service official.  16 U.S.C. § 1604(I); 36 C.F.R. § 219.10.

14          Here, the responsible Forest Service official approved the

15  Project, and, for the reasons discussed above, Defendant complied with

16  NEPA in adopting a FONSI for the Project.  (Admin. R. at 1276-84,

17  1341-1414.)  Hence, through the prism of APA, the NFMA issue is

18  whether Defendant arbitrarily and capriciously concluded that the

19  Project complies with the STNF Plan.  5 U.S.C. § 706(2)(A).

20          A.   *Sensitive Species Survey Requirements*

21          As explained above in section II.B.1, the EA and its

22  incorporated analysis reports evaluate in detail the Project's effects

23  on Forest Service Sensitive Species, and these analyses rationally

24  relate to the conclusion that the Project will have an insignificant

25  effect on the species.  This finding refutes Plaintiff's contention

26  that the Project frustrates Defendant's obligation under NFMA to

27  "provide for diversity of plant and animal communities."  16 U.S.C.

28  § 1604(g)(3)(B).

          B.   *Management Indicator Species Requirements*

          Plaintiff argues that Defendant violates NFMA because Defendant did not implement a hard quantitative population survey of MIS.  (Pl.'s Br. Supp. Summ. J. at 50-53.)  Rather, Defendant relied on "habitat assemblages to be used as management indicators for projects."  (Def.'s Br. Opp'n Summ. J. at 44.)[13]

          The Ninth Circuit thrice declined to adopt Plaintiff's position that NFMA's regulations require hard quantitative population surveys.  See Idaho Sporting Cong., Inc. v. Rittenhouse, 305 F.3d 957, 972-973 (9th Cir. 2002) (citing Inland Empire, 88 F.3d at 761 and Thomas, 137 F.3d at 1153-54).  Although the Rittenhouse court rejected the agency's use of the proxy-on-proxy approach, that rejection was held appropriate because the "[agency's] methodology [did] not reasonably ensure viable populations of the species at issue."  305 F.3d at 973.[14]  Here, Plaintiff does not argue that Defendant implemented a methodology for monitoring habitat that failed to "reasonably ensure[] . . . viable populations [of MIS]."  Rittenhouse, 305 F.3d at 972.  Rather, Plaintiff argues that Rittenhouse effectively overruled Inland Empire and Thomas, and adopted the reasoning of other circuits that the proxy-on-proxy approach is *per se*

          [13]   This use of habitat assemblages is commonly referred to as the proxy-on-proxy approach.

          [14]   More specifically, the Ninth Circuit noted that "the record demonstrated that the Forest Service's methodology for dedicating old growth is so inaccurate that it turns out there is no old growth at all in management area 35, where the Forest Service has purported to dedicate 1,280 acres of old growth." Rittenhouse, 305 F.3d at 972.  Further, the Forest Service's own wildlife expert opined that it would be necessary to assess MIS habitat independent of any old growth analysis, because "[old growth habitat and pileated woodpecker habitat] may or may not overlap."  Id.

1 | contrary to NFMA.  (Pl.'s Br. Supp. Summ. J. at 53 (citing <u>Utah Envt'l</u>
2 | <u>Cong. v. Dombeck</u>, 372 F.3d 1219 (10th Cir. 2004).)  Plaintiff's
3 | contention misconstrues <u>Rittenhouse</u>, and out-of-circuit decisions
4 | adopting a *per se* prohibition on the proxy-on-proxy approach do not
5 | undermine either <u>Inland Empire</u>, <u>Thomas</u>, or <u>Rittenhouse</u>.[15]

6 |          C.   *Aquatic Conservation Strategy*

7 |          Plaintiff complains that "[t]he EA promised that the ACS
8 | objectives would be met at the project-specific level; but after
9 | public comments were in, [D]efendant applied the recent changes to the
10 | ACS to allow it to escape project-specific compliance."  (Pl.'s Br.
11 | Supp. Summ. J. at 54.)  While Defendant asserts that it need not
12 | comply with the ACS, the EA evaluates the Project against the ACS
13 | objectives and its evaluation rationally relates to its conclusion
14 | that the Project in fact complies with the ACS.  (Admin. R. at 1379-
15 | 81.)  Plaintiff's specific contentions that the Project violates the
16 | ACS are not supported by the Administrative Record for the reasons
17 | already addressed in this Order.

18 |                         **CONCLUSION**

19 |          For the stated reasons, Plaintiff's motion for summary
20 | judgment is denied, and Defendant's motion for summary judgment is
21 | granted.

22 |          IT IS SO ORDERED.
23 | Dated:  August 19, 2005

24 |

25 |

26 |          [15]   Consequently, it is unnecessary to determine whether,
     | as Defendant contends, recent amendments to the National Forest
27 | System land management planning framework that explicitly adopt
     | the proxy-on-proxy approach are applicable to the Project.
28 | (Def.'s Br. Supp. Summ. J. at 45 (citing 70 Fed. Reg. 1023, 1060
     | (Jan. 5, 2005)).)

1                              /s/ Garland E. Burrell, Jr.
                               GARLAND E. BURRELL, JR.
2                              United States District Judge

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28